All right, we'll proceed to our last case for the day. Thank you, your honor. May it please the court. My name is Jonathan Byrne. I'm appearing this morning on behalf of Ryan Kibble, who is the defendant below. Mr. Kibble suffers from a congenital heart defect as well as recent onset non-alcohol related cirrhosis of the liver. He's also incarcerated in the middle of a global pandemic. The district court correctly concluded that those are compelling and extraordinary reasons that could justify Mr. Kibble's compassionate release. However, the district court was incorrect in concluding that Mr. Kibble's release would pose a danger to the community or would be inconsistent with the sentencing factors laid out in 18 U.S.C. 3553A. The district court ultimately abused its discretion by denying Mr. Kibble's motion for compassionate release, and we'd ask this court to reverse that as soon as practical. The district court's decision to deny Mr. Kibble's release came down to two separate provisions. The first was the district court's conclusion that Mr. Kibble would be a danger to the public if he was released. That is not supported by the record in this case, which shows that not only would Mr. Kibble, when he is released, be on a supervised release and would be released to a stable home environment, but that Mr. Kibble was on bond for nine months after his arrest prior to his sentencing. And even after his sentencing, the district court determined that it was appropriate to let Mr. Kibble self-report, and in doing so concluded that he was not a flight risk or a danger to any other person in the community. He spent another month on bond before he reported. Yes, Your Honor. Mr. Byrne, could you also give us an update on Mr. Kibble's medical condition as it relates to COVID? Your Honor, what I am aware of with regards to that, he did test positive at one point in this litigation, but as far as I'm aware, he did not develop any symptoms. So I'm not sure if that was a flawed test or if he dodged a bullet. As of last week, it's my understanding that he has not been vaccinated yet, and it's my understanding that while there is a plan within the Bureau of Prisons to provide vaccinations to inmates, it's kind of hit or miss at this point like it is out in the rest of the world. And the current situation at FCI Elkton, which is where he is still incarcerated, is that there are five inmates and 30 staff members who are currently affected with COVID. There have been nine deaths at that institution. You're saying nine deaths from COVID? Yes, Your Honor. Thank you. You're welcome. As I said, Mr. Kibble would be on probation for 15 years, where he'd be granted compassionate release. He has numerous special conditions that have been imposed, including a requirement of mental health treatment, requirement that he undergo a sex offender evaluation and participate in any recommended treatment based upon that evaluation. There are conditions that keep him from being around minors, from using computers and other things that would protect the public from any misbehavior on his part. Yes, Your Honor. Mr. Byrne, I'm trying to make sure I understand the abuse of discretion argument here. I certainly understand the merits and the substance of the arguments made below in the appeal. But the district court, from reading the opinion, appears to have addressed all those concerns, considered them, and determined that the factors, including those under 3553A, were such that it exercised its discretion to deny the relief. And as you know, the district court did find extraordinarily compelling circumstances. So here's my question. Under your argument, if we have a COVID outbreak at a prison, does a district court have discretion to deny a compassionate relief motion? Or are you saying that the existence of the you're saying? No, Your Honor, that's not our position. Our position is entirely related to the particularities of Mr. Kibble's situation. I'm sorry to follow up. I hope I'll give you time to answer. So I'm sorry to cut you off as you start. But anticipating that, so let me take my question a little bit further. If you're a prisoner with COVID with the types of underlying conditions that make you have a heightened risk or a certain level of risk, at that point, does the district court not have discretion? No, Your Honor. I think the district court always has discretion based on the equities of any particular case. I can conceive of a situation where you Mr. Kibble, but who was serving a life sentence for a homicide. And in that case, the question of release is a much different question because Mr. Kibble is going to be released at some point. It's a question of when. And our position is both his medical condition, the facts of his case should have led the district court to the opposite conclusion. Let me ask one other question. And I think I appreciate your answer. The government is brief. I think said something to the effect that if we were to order, really, that it be temporary. Do you believe we have the authority to grant compassionate release for a certain period of time and then order? Or does the district court have this authority to grant relief for a certain period of time and then order the return to prison for the remaining of the sentence? I am not aware of any courts that have decided that issue, Your Honor. What's your position about it? Our position would be that the district court would not have that authority. Once the release is done, because you're going to have a situation where Mr. Kibble would be on supervised release. And if he had problems on release or violated, he could be revoked for that. But if he is released and six months or a year goes by, who knows how long this is going to continue, and he's performing well on supervised release, it shows that the sentence that he actually served was the appropriate sentence. If the primary basis is really not a challenge to the underlying sentence, it doesn't seem to me. It seems like what you're talking about is the presence of the COVID pandemic and his risk to it whether he got it and is recovered. Even if none of that was true, wouldn't the COVID situation, you're right, we don't know how long it's going to be there. But if hypothetically, in six months, everyone's vaccinated, it's not rampant at Elkin, it's not completely gone, it's nowhere near the risk that you would posit it is now. Why would there be a restriction to allowing release for a period of time to end and then be returned? I think largely it would be a question of the equitable aspects of it, in that you would have a person who would be released to the community and would be reintegrating into the community, who would then be, through no necessary fault of their own, like in a supervised release revocation, be put back in prison. I don't think the 3553A factors would support that because if you look at the district court's original explanation of its sentence, which is at page 152 of the joint appendix, the only factor he really specifically mentioned, aside from the offense itself, was the need for deterrence. The record supports the idea that Mr. Kibble has been deterred. He was out in the community for nearly a year without any issues. If he were released and was again out in the community for six months a year without any issues, then the main concern of the district court, which was the need to deter this conduct, would be addressed. And so I don't think that is a situation where the district court would have that authority. Yes, Your Honor. Okay, but Mr. Kibble, if you look at joint appendix 366, the district court did make a factual finding regarding the defendant's dangerousness, saying the court cannot ignore the dangerous nature of defendant's conduct, nor is it assured that the defendant would not present a danger to other minors if released from prison. So that seems to me to be a fact-specific finding relating to his likelihood of being a danger to others that was the basis for the court's exercise of its discretion not to release him. So you haven't addressed the fact that the district court seems to think he would well be a danger to other minors if released from prison. Yes, Your Honor. We think that conclusion is incorrect and not supported by the record because this is a case where we have, again, this basically 10 months of good conduct under supervision, which is the kind of supervision Mr. Kibble will have for the next 15 years. And we also have the other finding of the district court at sentencing that he was not a danger to the community. So there's a conflict there. And I think that finding is more supported by the record than the district court's finding in the denial of the compassionate release motion. I guess, though, you know, you have a situation here when the district court ruled Mr. Byrne had only served 10 percent of his sentence. Now he's, what, served about 20 percent? About a quarter, yes, Your Honor. The district court was making the factual finding in terms of the compassionate release in a different factual context. The district court may have said that he's not a danger to the community once he serves a long sentence. But, you know, he's barely gotten started here, and I can't say he won't be a danger to others if released. If that's the case, it would have been an unusual decision to leave him out on bond to self-report for a month if he was a danger. Alternately, it's a suggestion that what makes him dangerous is his term of imprisonment, in which case that further mitigates against or towards cutting it short as soon as we could. No, in other words, he hadn't served enough of his time to make an impression on him that this is not conduct that society finds acceptable. Well, I think the record as it exists now shows that Mr. Kibble did have, has come to that conclusion, and it's bolstered now by almost a year's worth of imprisonment. And it's not only a year's worth of imprisonment in a regular world, but in a COVID world. I know I keep coming back to that, but it's hard to avoid. Time in prison during the pandemic has been harder than regular time. Facilities have been locked down. There's been no visitation for places. Programming has been cut back, and so Mr. Kibble has been subject to that for nearly a year. In addition, as I mentioned, he'll have this 15-year term of supervised release. When he's released, he'll have to register as a sex offender. He has, obviously, he's lost employment. His life has pretty much been upended by this, and it seems like the message got through to him. Because in all that time on Bond, there's no evidence that he was surreptitiously going back on the internet, that he was hanging out places where minors were present, or anything like that. The record suggests that the message has been not just sent, but received from Mr. Kibble. Mr. Byrne, may I follow up on your response to Judge Quattlebaum about whether or not you could sort of call out, does the district court have the authority to call out or fashion a remedy, having found the extraordinary circumstances health-wise and the danger of COVID? In this case, he found as a matter of fact, it existed. So, he has to balance the other thing. But you seem to suggest that it's all or nothing. Why couldn't he say, well, the danger here exists now that COVID, obviously, is rampant, and we don't know, vaccination, you got morbidity rate is high where he is now, and say that he will remain until, for example, if we get to a phase that's close to what we call normal, from a scientific public health standpoint, until that time he's on house arrest with restrictions, and then after which he will return to his someplace in the Bureau of Prisons for confinement. You seem to eschew that completely. Why is that? Well, I see my time's up. If I can go ahead and answer that question. You can. I don't want to preclude the court doing that if that is the best result that we can hope for. I simply think that a situation... Mr. Quartermile wasn't asking you to give up on your main point. He was just asking you, do you, the question was, the authority to do it. Obviously, we know that you don't want that, but the question was authority. He didn't ask you to give up your main. Now, go ahead. When it comes to the question of authority, like I said, I am not aware of any court that has exercised or held that district courts have that authority. It's not evident from the plain language of the statute. That's because it's discretion, and it's trying to deal with the situation right now. It could be other extraordinary circumstances, but right now it's COVID, and he found that it or abstract, is it? You're dealing with a temporal, we hope and pray it's temporal, in short, in that situation we're in. When we're trying to address that, when that's over, don't you go back and serve your time that you have to until someone says, you're ready for some kind of parole for other circumstances or at least like your age or whatever, but why wouldn't that be in the wheelhouse of remedy under the statute? I'm just not certain, your honor, that without it being specifically laid out in the statute, that that's an authority the district court would have. I'm not certain that it is not, but I'm unaware, particularly because generally the law is a sentence once imposed is final, and the district court only has the authority to go back and do it to the extent the statute or another statute says you can. And what do you say the statute says they can do? Order compassionate release, and in my conception, release is release, is a termination of your sentence. You're putting that on it, it just says release. It could be released for a period of time. You're putting on it that, you're adding something to it. There was a reason why it said release, because don't you think in terms of statutory construction would be released for two months, released for a year, two years, or released as you suggest for the entire sentence, active incarceration. Do you agree with that in terms of statutory interpretation? Yeah, I agree that it could mean that. I'm not certain that that is what Congress intended. I'm sorry, go ahead, Chief. No, just to follow up there, I mean, isn't almost the corollary of saying that authority doesn't exist pretty kind of akin to saying a temporary situation like we have here is not contemplated by the compassionate release statute? I mean, I think that's a, you know, quite frankly, I think that's a fairly dangerous position to advocate and almost undermines whether COVID could be even the basis for. I don't think so, Your Honor, because I think what the court can consider in terms of the basis for compassionate release are fairly broad, as some recent decisions of this court have held, but I'm not sure that necessarily plays into what the potential relief is. All right. Thank you. Ms. Harrell. Thank you, Your Honor. May it please the court. The district court did not abuse its discretion in denying compassionate release for this defendant. The basis of this denial was the Section 3553A factors, which the First Step Act specifically calls out as something that must be considered in addition to those extraordinary and compelling circumstances to determine if release is appropriate. The court's bases were the egregious nature of the offense, which had just been articulated by the court at the sentencing a few months prior, the minimal portion of the sentence that the defendant had served, and importantly, not so much the need for specific deterrence of Mr. Pibble, but the importance of general deterrence. And that's also laid out in his order with regard to the length of this sentence. The district court had a very valid concern that a roughly 90% reduction in his would undermine the reflection of the seriousness of the offense, it would undermine the general deterrence that he was so concerned with at the initial sentencing only a few months prior, and it could create unwarranted sentencing disparities. And the court reasonably took into account the fact that this particular defendant had already tested positive for COVID, given that the entire argument for compassionate release is to avoid exposure to COVID in a prison situation when you have the kind of high risk factors that the defendant does have. That is substantially reduced as a concern when they have already contracted it. And to this day, the understanding is that reinfection is fairly unlikely. And we're also at a point where vaccines are rolling out in the BOP. Another factor you look at is the nature of the risk in that particular facility. And as Mr. Byrne pointed out, Elkton currently has only five inmates that have active cases. So obviously, they have really brought into control the outbreak at that facility. How many people at that facility? How many people? How about you? I believe there's about 1,100. It could be a little more. I might be thinking that there's 1,100 sex offenders there. I remember looking at the statistics and I apologize that I did not look that up. But it is over 1,000 individuals. Perhaps Mr. Byrne can correct me on those details when he comes back to rebut this. But it is a large number of individuals at that facility, and only five of them are currently active with infections of COVID. It seems that staff is actually much more at risk in that facility right now than the inmates themselves. I would assume that in terms of science, we don't know what it means having been exposed, not exposed, but to test positive for COVID has to do in terms of connection of being reinfected. We don't know that. That is true, Your Honor. We don't know. So the fact that he's had it before, we can't say it lowers the chance that he won't get it again. We don't know that. That is true. Obviously, we could conclude that it shows that he's susceptible to it more than other people, and more likely than someone who, right? We could argue both sides of that in terms of the science. Well, as far as the science, I don't know that any one person contracting it means that they have a predisposition to contract it. But also along those lines, we could also argue that he apparently has a predisposition to be able to fight it off with his own body because he contracted it and never had any symptoms. So that could also be an argument that he seems to have a natural immunity that other people do not have despite his medical conditions. But again, even with these issues, those are up for debate. But what the court based it on, the court didn't argue that he did not have this extraordinary and compelling circumstances based on the conditions of the prison and his medical condition. The court based its ruling on the 3553A factors. And primarily, while it did offhandedly reference his positive case, its primary concern was the general deterrence effect and the nature of the offense and his concerns about this individual's release into the community. Well, you must admit, I mean, I think you would admit that Mr. Burns' point is, assuming, not assuming, as stated, dangerousness was a concern under 3553 factors. But you have to, as I was saying, conceive that it is a little inconsistent with his pre-trial release, right, post-conviction release, and post-sentencing voluntary reporting, isn't it? Your Honor, just to... I don't think they are complete... particularly to the point that the other 3553 factors would be overridden. But just to point out the specifics with regard to his release following his plea hearing, in the record, and it's at JA44 through 46, it was discussed that typically this offense would require remand following that plea. But a couple factors, and it was specifically discussed, one, this was an 11c 1c plea. And the court did not judge him guilty at the plea hearing because he wanted to review the PSR and determine whether he was going to accept that binding plea agreement. But further, when he asked for the United States position, the United States had spoken with defense counsel, and Mr. Kibble was scheduled to have a surgery in the time between the plea hearing and the sentencing. And that surgery would have been unable to be completed had he been remanded to the regional jail during the time between his plea and his sentencing. So because of that, the United States opted to find that that was a circumstance that would warrant his release on the restrictive electronic monitoring conditions that he was under at the time. And given the short period of time for self-report, I think the court at sentencing simply said, you've been on this for a long time. I'm going to give you this additional month before you report. That covers one leg on the three-legged stool. What about post-conviction? That is post-conviction, Your Honor. I think he looked at it as, I'm giving you a very firm report date that is a month out, and essentially continued this bond. Post-conviction? How long was he out post-conviction? Well, he... Conviction and the sentencing. Oh, conviction and sentencing. That's what I was just addressing, Your Honor. He was not actually a judge guilty until his sentencing. The court did not make an adjudication at his plea hearing. It withheld that, held it in abeyance until the sentencing. And the time period between when he was a judge guilty at the sentencing hearing and his self-report was 30 days. And again, that time period between the plea hearing and the sentencing is when he that surgery. And that surgery was what was considered the specific reason that he was allowed to remain on that bond. So I think that those specific circumstances undercut an argument that he can't be found dangerous now because he was allowed to remain on electronic home confinement during his dependency of his case, following a month of detention in the early portions of his release, or in the early portions of his case. For nine months, he was allowed to be out, correct? Yes, Your Honor. But again, dangerousness is also only one of Section 3553A factors. And while the court did make this finding in its order that he was a danger, it also specifically said, regardless of whether I found the danger or not, I still believe that the 3553A factors alone warrant the denial of this motion. And the discretion that... Which one is beyond dangerousness? What's the other one that he mentioned? As far as 3553A, Your Honor? Yeah. With 3553A, he focused on the nature and circumstance of the offense, the egregious conduct that was engaged in. And again, he referenced the general deterrence, which general deterrence was his primary driving factor at the original sentencing. He specifically stated at sentencing that this case cried out for a sentence at the top end of the guidelines to allow for maximum deterrent effect. And in that context, he was speaking about general deterrence, not specific deterrence for Mr. Pibble. But the court also looked to the fact that he had only served 10% of his sentence, that to release him now under 3553A would undermine the importance of just punishment. It would undermine a reflection of the seriousness of the offense. And it would additionally create unwarranted sentencing disparities between individuals who had engaged in similar conduct and who were serving many years. For the defendant to get out after serving only a few months, the court felt would create those unwarranted disparities under Section 3553A. And these are all reasonable bases for this conclusion. And the standard here is abuse of discretion. And essentially, Mr. Byrne is arguing that once you have found that there is COVID in your prison, and once you've established that there are these medical necessities to get the compelling circumstances, that trumps the remaining 3553A factors. And that's simply not the case. If that was the case, the First Step Act would not have included a requirement to consider 3553A. And the court is well within its discretion, having known the record, having met the defendant, having participated in this case, to find that the other 3553A factors outweigh the danger. There's nothing in the record to suggest that the court did not find that there was a concern about COVID at FCI Elkton. And there was never a question whether the defendant had these qualifying medical conditions. So the court did not inappropriately ignore those. It simply found, based on the reasons it's articulated, that those factors were outweighed by other reasonable 3553A factors. And the fact that others may disagree in the balance, which is what is argued by defendant, does not render the court's decision an abuse of its discretion. And if there are no further questions, the United States would simply find that since there cannot be shown an abuse of discretion, and the court did not abuse its discretion, its order denying the motion for compassionate release must be affirmed. Counsel, you do agree that in terms of looking at this in terms of giving some jurisprudential guidelines, that notwithstanding, the court can use their discretion in terms of looking at 3553A sometimes it could be too heavily focused on one factor and make it unreasonable, correct? It could, Your Honor. The United States position, however, is that a focus, which is what is asserted by the defendant, on solely the danger in the prison and the medical conditions. That would be too far weighing on only one. The judge looked at literally all of the other factors. He named four or five additional factors beyond that situation at the prison and the defendant's medical circumstances as outweighing that. So this wasn't something where the judge relied on one factor and decided that one factor alone outweighed it. It looked at a number of different factors. And that is not an inappropriate single focus on one factor, ignoring all others. For example, what I mean is this. I think you said it was 10% of his time had been served, only 10% of the time. You can't rely too much on that numerical factor, can you, when the statute, when it says that they shall have the right to be considered for this release on this basis. And here they did find the compelling medical situation. So, well, that would say per se rule, okay, if you serve less than 50, you don't get it. You couldn't do that, could you? No, Your Honor. This is a very individualized situation. And the United States is not arguing that there is a bright line rule of you have to serve this percentage. The court is correct. That's not articulated in the First Step Act. But in this particular circumstance, the court found that this, the offense itself, the conduct this defendant engaged in, the importance of general deterrence, the importance of reflecting the seriousness of the offense simply could not be the court felt at the sentencing hearing that a sentence at the top end of the guidelines was appropriate given 3553A and felt that those purposes would be so undermined by a 90% reduction sentence in this particular case that it was not warranted. I'm trying to find some guidelines. So I'm trying to get your wisdom here. What about, can the court look at the Eighth Amendment factors? That is that COVID, for example, is so rampant in the place of incarceration that it would be cruel and unusual punishment to keep a person in a place there with a morbidity rate that high in terms of, he wasn't sentenced to execution or life. So for example, would that be appropriate? Look at Eighth Amendment concerns, a constitutional question under this First Step Act? Your Honor, particularly in light of the recent decision in McCoy, courts are, when you look at the policy factors that could be interpreted, arguably the Eighth Amendment could be a factor in that. But obviously the Eighth Amendment itself has very high standards for what actually would constitute cruel and unusual punishment. So I think that there would be a heavy burden to establish that COVID alone in a prison situation constituted cruel and unusual punishment, particularly since COVID exists outside the prison facilities as well. I think this is a very unique circumstance. Obviously the court in establishing, looking to policy could look to many different factors. So I don't think there's anything that necessarily would preclude looking to the Eighth Amendment, but I do not think that in most cases that would be something that would be reached on an individual basis as a reason to over overshadow the 3553A factors if those factors weighed against release. Yes, Your Honor. I have a question. I don't think this is part of this case, but I kind of, as we kind of reflect on this issue that's new is, is it appropriate in considering the COVID issue to, if that's going to be a factor in the prison, is it appropriate to look at the risk of COVID in the situation to which the defendant would be released? I think that is a factor that is appropriate, Your Honor, to look to. In some situations, there have been cases where a prison facility that a particular defendant is in has very low rates, and they were requesting to be released to, say, a residential halfway house that had in and out traffic regularly in a community that had a high level of community spread, which arguably would be a greater risk than the prison itself. However, it's one of those factors that has to be viewed very cautiously, because just like the situation in prison, the situation out of the prison is going to be very fluid, and a case that could be a residence that might at this point be safer could easily become more dangerous as the prison gets under control and that community has community spread. So, especially given the temporary, hopefully, nature of this pandemic, that is a consideration I don't think the court would be prohibited from making, but I think it has to be taken with great caution. All right. Anything further for counsel? If there are no further questions, I would rest on my brief, Your Honor. Thank you, Ms. Hammond. Mr. Byrne, you have some time reserved. Yes, Your Honor, and to begin, I'm happy to admit when I'm wrong, and I want to point the court on the issue of the district court's ability to do something other than order complete release, I want to point the court to United States v. Lagan, which is 18 CR 283, docket number 91. It's in the Northern District of New York, 2020, and in that case, the court held and has made citations to other courts that have also held that the statute allows only for release, not a temporary placing back into the community that would then end when the extraordinary and compelling reason would be gone. So, there has been a court that has decided that. I wasn't aware of that. Now, you're pointing to authority that supports your position. Yes, which I didn't know existed until 10 minutes ago. So, on the issue of when the district court allowed Mr. Kibble to remain on bond pending his self-report, without taking issue with anything that Ms. Harreld said, I would point the court to what district court found, and this is at page 154 of the joint appendix. The court says, Mr. Kibble, you performed up to standards on bond. The problems were electronic and telephone problems that weren't your fault, as I understand. So, I'm able to find that you have complied with three conditions of bond. I find that in view of that, you're not a flight risk or a danger to any other person or the community under the present circumstances. And so, I would come back again to what has changed after this time, and it does not square with the record. To comment on something that Judge Quattlebaum brought up with my colleague, while there may be situations like Ms. Harreld suggested where someone is requesting release to a halfway house, or maybe there was the Rainey case that was cited in the brief where the person seeking relief was basically homeless, Mr. Kibble would be much better off in terms of COVID precautions released at home, able to comply with social distancing guidelines, which could be incorporated as additional terms of supervised release if the Another thing about the COVID situation is I don't think we can assume that because Mr. Kibble got a positive test and didn't get sick that he's immune. And indeed, in the government's brief, they didn't take issue with the district court's conclusion of extraordinary and compelling circumstances. They relied on the 3553A factors. If there are not any other questions, I believe that's all I wanted to address on rebuttal. Thank you, Your Honors. Thank you. I thank both counsel for your fine arguments, and we can't come down and shake your hand, but please know that we really appreciate your being here and helping the court and letting us pick your brain about the broader issues as well as your specific to this case. And we thank you so much and hope that you'll be safe and stay well. With that, I'll ask the clerk to adjourn the court. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Roger L. Gregory, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.